(No. 107236.—

*In re* JOHN O. CUTRIGHT, Attorney, Respondent.

*Opinion filed June 4, 2009.*

---

Steven R. Splitt, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William F. Moran III, of Stratton, Giganti, Stone, Moran & Radkey, of Springfield, for respondent.

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) filed a three-count complaint against respondent, John O. Cutright (Cutright), charging him with various violations of the Illinois Rules of Professional Conduct (Rules). The Hearing Board recommended that Cutright be suspended for 120 days and be required to successfully complete the professionalism seminar of the Illinois Professional Responsibility Institute. The Administrator timely filed exceptions to the report and recommendations of the Hearing Board with the Review Board (210 Ill. 2d R. 753(d)(2)). The Review Board recommended that Cutright be suspended for six months. The Administrator filed a motion to approve and confirm the report and recommendation of the Review Board pursuant to Supreme Court Rule 753(e)(6) (210 Ill. 2d R. 753(e)(6)). We denied the Administrator's motion and transferred the case to the general docket and designated the Administrator as the appellant.

### I. BACKGROUND

Cutright was admitted to practice law in Illinois on November 29, 1967, and began his law career in private practice working in his father's law office, which then became known as Cutright & Cutright Law Office, the name that it retains today. In addition to maintaining his law office, he was appointed the public defender of Cumberland County in 1990. His practice is centered predominantly on tax and real estate work, but also includes some criminal defense, probate matters and bankruptcies. Cutright has no prior disciplinary complaints against him.

The charges in the ultimate complaint allege that Cutright violated various rules of the Illinois Rules of Professional Conduct including: Rule 1.7(b) (engaging in a conflict of interest) (134 Ill. 2d R. 1.7(b)); Rule 8.4(a)(4) (conduct involving fraud, dishonesty, deceit or misrepresentation) (210 Ill. 2d R. 8.4(a)(4)); Rule 3.5(h) (giving or lending anything of value to a judge, official, or employee of a tribunal) (134 Ill. 2d R. 3.5(h)); Rule 8.4(a)(5) (engaging in conduct that is prejudicial to the administration of justice) (210 Ill. 2d R. 8.4(a)(5)); Rule 1.3 (failing to act with reasonable diligence and promptness in representing a client) (134 Ill. 2d R. 1.3); Rule 1.4(a) (failing to keep a client reasonably informed about the status of a matter and failing to promptly comply with reasonable requests for information) (134 Ill. 2d R. 1.4(a)); and Rule 1.4(b) (failing to explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation) (134 Ill. 2d R. 1.4(b)). The complaint also alleged that Cutright violated Supreme Court Rule 770 (210 Ill. 2d R. 770) by engaging in conduct which tends to defeat the administration of justice or bring the courts or the legal profession into disrepute.

### A. Representation of Martha Hayden

In count I of the complaint the Administrator alleged that Cutright (1) breached his fiduciary duty to his client; (2) engaged in a conflict of interest by representing a client when the representation was materially limited by the lawyer's responsibilities to another client (134 Ill. 2d R. 1.7(b)); (3) engaged in conduct involving fraud, dishonesty, deceit, or misrepresentation (210 Ill. 2d R. 8.4(a)(4)); and (4) engaged in conduct "which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute" in violation of Supreme Court Rule 770 (210 Ill. 2d R. 770).

All of the allegations in this count arise from Cutright's representation of Martha Hayden (Hayden)

which commenced in 1993 when Hayden asked him to prepare her will. She also asked him to prepare a document to forgive a debt owed to her by the Cochonours, a wealthy Cumberland County family. During this time, Cutright also represented Ruth Cochonour, the executor of the estate of Clark Cochonour. Triple C Thorostock, an entity in which Clark Cochonour and his three sons were principals, owed Hayden $312,900. Cutright did as Hayden requested and prepared a will for her which forgave the entire debt owed by the Cochonours and left the remainder of her estate to her two nieces. When Cutright explained that the will would take effect only upon her death, she asked him to draft a document that would forgive the Cochonours' debt immediately. He did so, and Hayden signed the document.

At the time Cutright drafted these documents for Hayden, she was 86 years old. Cutright testified that he believed that she was of sound mind and competent. However, numerous friends and family members, as well as Hayden's physician, testified that Hayden was often confused and had little short-term memory. Hayden's physician also testified that in 1993, Hayden was in the second stage of Alzheimer's disease. He testified that while she did have periods of lucidity, he did not believe that she could have executed a will or a cancellation of a note in February 1993. Hayden died of a stroke caused by Alzheimer's disease in 2001. In a later will contest, the circuit court found the will invalid based on Hayden's lack of testamentary capacity.

During his testimony before the Hearing Board, Cutright testified that he never inquired as to the financial status of Hayden's estate. He indicated that he believed that he knew the extent of her property based on his previous dealings with her family in 1966 and the early 1970s. Unbeknownst to Cutright, Judge Robert

Cochonour, the son of Clark Cochonour, was a signatory on Hayden's checking account and had a right of survivorship on the account.[1] Cutright testified that he had no knowledge of Judge Cochonour or anyone else influencing Hayden's decisions. After Hayden died, Judge Cochonour was convicted of stealing money from the estate of Jay Hayden—Hayden's predeceased son—where he served as the executor.

With respect to count I of the complaint, the Hearing Board found that Cutright violated Rule 1.7(b) by representing Hayden when his representation was materially limited by his responsibilities to the Cochonour estate. The Hearing Board further determined that Cutright's conduct tended to bring the legal profession into disrepute, in violation of Supreme Court Rule 770. However, the Hearing Board found that the Administrator failed to establish that Cutright knew or should have known that Hayden was incompetent to make decisions about her finances and her estate. Relying on the evidence that Cutright was acting in accordance with Hayden's wishes when he cancelled the Cochonours' $312,900 debt, the Hearing Board found that Cutright did not breach his fiduciary duty to Hayden. The Hearing Board also found no evidence of fraud or dishonesty in Cutright's dealings with Hayden.

The Review Board agreed with the Hearing Board that Cutright engaged in a conflict of interest. However, the Review Board found, contrary to the Hearing Board, that he did breach his fiduciary duty to Hayden by canceling the debt owed by the Cochonour family, without making any inquiry into Hayden's financial circumstances.

---

[1]Judge Robert Cochonour was a sitting judge in Cumberland County from 1990 until 2002. Although Robert no longer serves as a judge, because he was a sitting judge during the period discussed in this case, we will refer to him as Judge Cochonour throughout this opinion.

The Review Board determined that there was no dispute that Cutright owed Hayden, his client, a fiduciary duty.

## B. Preparation of Judge Robert Cochonour's Tax Returns

In count II of the complaint, the Administrator alleged that Cutright (1) gave or lent something of value to a judge (134 Ill. 2d R. 3.5(h)); (2) engaged in conduct involving fraud, dishonesty, deceit, or misrepresentation (210 Ill. 2d R. 8.4(a)(4)); (3) engaged in conduct that is prejudicial to the administration of justice (210 Ill. 2d R. 8.4(a)(5)); and (4) engaged in conduct "which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute" in violation of Supreme Court Rule 770 (210 Ill. 2d R. 770).

Cutright represented the executor of Clark Cochonour's estate, Clark's widow, Ruth Cochonour. Cutright was also working as the public defender in Cumberland County. During the period of 1996 through 2000, Cutright reviewed Judge Cochonour's individual federal tax returns. With respect to these returns, Mildred Carlen[2] testified that she signed Cutright's name on Judge Cochonour's 1997, 1999, and 2000 individual federal tax returns. Cutright was unclear about the 1996 and 1998 individual tax returns, as his name was printed as the paid preparer,[3] but there was no signature. During the period of 1997 to 1999, Cutright reviewed the Illinois fiduciary income and replacement tax returns of the Jay Hayden estate. Cutright acknowledged that those tax returns were reviewed and signed as paid preparer by either himself or Mildred. During the period of 1995 to

---

[2]Cutright acknowledged he authorized Mildred Carlen, his secretary, to sign his name on tax forms that he had already reviewed.

[3]A paid preparer is required by law to sign the return form and fill in the preparer areas of the form. http://www.irs.gov/individuals/article/0,,id=133088,00.html.

2000, Cutright also reviewed and signed as paid preparer numerous tax returns for business entities in which Judge Cochonour had an interest. Cutright did not bill either Judge Cochonour or the Clark Cochonour estate for his work on any of the tax returns.

Cutright testified as follows. Robert Doerr, the Cochonour's accountant, asked him to review the tax returns for the Cochonours' business entities. Initially, he declined. He later agreed to review the tax returns for the Cochonour's business entities as they were related to the Clark Cochonour estate. Cutright admitted that he reviewed and signed as paid preparer the federal partnership returns for the Cochonour's business entities from 1995 to 2000. He did so because he believed that he was representing Ruth Cochonour, as executor of Clark's estate, not Judge Cochonour. Thus, he intended to charge the estate for his work on the tax returns. Cutright also indicated that until January 2006, he never had any communication with Judge Cochonour about preparing or reviewing his individual tax returns. According to Cutright, he had no intention of making a gift to Judge Cochonour or the Cochonour family by reviewing the returns. Cutright acknowledged that the tax returns went through his office, but denied any personal recollection of reviewing Judge Cochonour's individual tax returns or the tax returns for the estate of Jay Hayden. He also acknowledged that, while he appeared in court before Judge Cochonour many times during the period in question, he never disclosed to opposing counsel the relationship that he shared with the judge.

The Hearing Board found that Cutright gave Judge Cochonour free legal services which were not a gift or favor allowed under the Code of Judicial Conduct, thereby violating Rules 3.5(h), 8.4(a)(5), and Supreme Court Rule 770. However, the Hearing Board found that Cutright did not intend to deceive anyone by failing to

disclose the improper gifts to opposing counsel; rather, he was unaware of his ethical obligations. Thus, the Hearing Board concluded that the Administrator did not prove a violation of Rule 8.4(a)(4).

The Review Board agreed with the Hearing Board that Cutright did not intend to deceive anyone by his omissions. In doing so, the Review Board rejected the Administrator's argument that dishonesty can be found by what amounts to a reckless omission. The Review Board determined that while ignorance is no excuse, neither is it a chargeable offense in this context. Thus, the Review Board found that Cutright did not violate Rule 8.4(a)(4).

### C. The Estate of Bessie Carpenter

In count III of the complaint, the Administrator alleged that Cutright (1) failed to act with reasonable diligence and promptness in representing a client (134 Ill. 2d R. 1.3); (2) failed to keep a client reasonably informed about the status of a matter and failed to promptly comply with reasonable requests for information (134 Ill. 2d R. 1.4(a)); (3) failed to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation (134 Ill. 2d R. 1.4(b)); (4) engaged in conduct prejudicial to the administration of justice (210 Ill. 2d R. 8.4(a)(5)); and (5) engaged in conduct which tends to defeat the administration of justice or brings the courts or the legal profession into disrepute (210 Ill. 2d R. 770).

In December 1986, Cutright agreed to represent the executor of Bessie Carpenter's estate in a proceeding to probate Bessie's will. Bessie died on November 30, 1986, and on December 4, 1986, Cutright filed the will. On December 8, 1986, Cutright filed a petition for probate of will and letters testamentary on behalf of the executor. Before he could complete Bessie's estate, it was necessary for Cutright to file a petition to partition certain

real estate. An order of distribution was filed on February 10, 1989. Herbert Carpenter, Bessie's son, who was initially appointed executor, died on March 11, 1988, before the conclusion of the partition suit. Glen Warfel was then appointed to act as administrator of the estate.

On March 22, 1989, Cutright filed a petition to approve the final report, for distribution, to discharge the administrator and close the estate in the probate case. Cutright set the matter for hearing on April 5, 1989. Subsequently, Charles Carpenter, another heir, informally objected to the final report on the basis that the report was incomplete. Cutright learned from Lucille Cooley, a friend and client who acted as a "go between" between him and the heirs, that there was a dispute between Charles Carpenter and the other heirs. Lucille informed Cutright that according to the heirs, they did not want to pay additional fees or expenses because of Charles' objections, and wanted to wait for Charles to die before moving forward to close the estate. Cutright admitted that although he did not verify this information with the heirs, they did not contact him about "finishing it up." Cutright then set the matter for hearing on August 1, 1989, for approval of the final report. No hearing was held on that date.

At least once a year when he prepared the tax returns for the estate, Glen Warfel contacted Cutright to inquire about its status. However, no further action was taken. Cutright advised Warfel that it might be easier to close the estate after Charles Carpenter, who was elderly, had passed away, since he objected to the way the estate was being handled. In June 1994, Charles Carpenter died. In July 1994, Cutright sent a letter to Charles Carpenter's attorney and asked him if he wanted to close the estate pursuant to information provided in the 1989 report. The attorney responded that he still had questions which were never answered. From 1994 to 2005, there was no

further action taken by Cutright on the Bessie Carpenter estate. Bessie's granddaughter Sandra Fear, an heir to the estate, testified that she periodically contacted Cutright regarding the estate, but her calls were never returned. While Cutright acknowledged that she had called the office a few times, he indicated that he did return one of her calls, but stopped returning her calls after she became irate.

Finally, in April 2005, during the process of preparing the estate's tax returns, Cutright asked that Warfel provide the accounting documents, and he then began working on closing the estate. On June 6, 2005, Cutright filed a motion to approve the final report and close the estate. On January 13, 2006, the estate closed and the proceeds were distributed by an order of the court over the objections of Charles Carpenter, which had been adopted by his widow.

The Hearing Board found that the Administrator proved by clear and convincing evidence that Cutright (a) failed to act with reasonable diligence and promptness in representing a client, in violation of Rule 1.3 of the Illinois Rules of Professional Conduct; (b) failed to keep a client reasonably informed about the status of a matter and failed to promptly comply with reasonable requests for information, in violation of Rule 1.4(a); (c) failed to explain a matter to the extent reasonably necessary to permit a client to make informed decisions regarding the representation, in violation of Rule 1.4(b); (d) engaged in conduct which tends to defeat the administration of justice, in violation of Rule 8.4(a)(5); and (d) engaged in conduct which tends to defeat the administration of justice, or to bring the courts or the legal profession into disrepute, in violation of Supreme Court Rule 770 (210 Ill. 2d R. 770).

The Review Board adopted the Hearing Board's findings on count III of the complaint. Neither party challenges the Hearing Board's findings as to this count.

### D. Evidence in Aggravation and Mitigation

The Hearing Board noted that Cutright's misconduct did not arise out of an isolated incident or involve merely a momentary lapse of sound judgment. Rather, his misconduct involved three separate matters. The misconduct involving his relationship with the judge continued for about five years and his neglect of the probate matter continued about 17 years. Thus, the Hearing Board, relying on *In re Thebeau*, 111 Ill. 2d 251, 256 (1986), found that "[t]his was not a single, quick or unreasoned failure of judgment, but rather a deliberate course of conduct."

The Hearing Board also considered in aggravation the fact that Cutright was an experienced attorney at the time of his misconduct. The Board noted in particular that Cutright was licensed in 1967 and worked with his father's law firm for 11 years, and took over the practice upon his father's death.

Further, Cutright's neglect of the probate estate caused actual harm to the heirs. Two heirs, Charles Carpenter and Gladys Carpenter, did not receive any distribution because they died before the probate matter was completed. Other heirs were forced to wait 17 years before receiving any distribution. Further, relying on *In re Lewis*, 138 Ill. 2d 310, 347-48 (1990), the Hearing Board found that Cutright failed to recognize the wrongfulness of his misconduct and failed to show any remorse for his misconduct or the effect it had on his clients or the legal profession. Finally, in aggravation, the Hearing Board found that Cutright did not fully understand his ethical obligations, particularly to his clients and to the courts. *In re Demuth*, 126 Ill. 2d 1, 15 (1988).

In mitigation, the Hearing Board found that Cutright did not act with a dishonest or evil motive. He had not been previously disciplined in his almost 40 years of practicing law. In addition, Cutright had six character witnesses who testified by deposition on his behalf. They

all testified that Cutright had a favorable reputation for honesty and integrity.

## II. ANALYSIS

The Administrator argues before this court that the Boards erred by finding that Cutright did not violate Rule 8.4(a)(4). The Administrator argues that Cutright's failure to inform opposing attorneys that he was regularly reviewing Judge Cochonour's personal and business income tax forms is a violation of Rule 8.4(a)(4). After reviewing the evidence, the Hearing Board found no violation of the rule because Cutright did not "intend to deceive" opposing counsel by his silence. The Administrator argues that recklessness with regard to the truth is sufficient to establish a violation of Rule 8.4(a)(4) when that recklessness can be considered knowing. Therefore, the Administrator argues that the Boards' finding is against the manifest weight of the evidence because the evidence shows that Cutright did intend to deceive. In the alternative, the Administrator claims that an intent to deceive is not necessary. The Administrator claims that Rule 8.4(a)(4) encompasses dishonesty and misrepresentation without an intent to deceive or defraud. The Administrator argues that it is the conduct, not the attorney's intent, that matters and that Cutright's conduct in failing to reveal his relationship with Judge Cochonour was "inherently dishonest" and supports a finding that Cutright violated Rule 8.4(a)(4). Finally, the Administrator argues that Cutright should be suspended from the practice of law for two years.

### A. Findings Regarding Tax Forms

With respect to Cutright's failure to disclose to opposing counsel his review of Judge Cochonour's tax forms, the Administrator argues that the Review Board's finding of no intent to deceive is against the manifest weight of the evidence. The rules governing our review

of the reports and recommendations of both the Hearing Board and the Review Board are well established. In a disciplinary proceeding, the Administrator bears the burden of proving the allegations contained within the complaint by clear and convincing evidence. *In re Timpone*, 208 Ill. 2d 371, 380 (2004). Moreover, the findings of fact made by the Hearing Board are to be treated virtually the same as the findings of any initial trier of fact. *Timpone*, 208 Ill. 2d at 380. Deference is to be accorded to the factual findings of the Hearing Board because the Board is in a better position to observe the witnesses' demeanor, judge their credibility, and resolve conflicting testimony. *Timpone,* 208 Ill. 2d at 380, citing *In re Spak*, 188 Ill. 2d 53, 66 (1999). This court will generally not disturb the Hearing Board's factual findings unless they are against the manifest weight of the evidence. *Timpone*, 208 Ill. 2d at 380. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Winthrop*, 219 Ill. 2d 526, 542 (2006).

We first turn to the Administrator's argument that this court should reverse the Hearing Board and the Review Board as to their finding that there was no dishonesty in Cutright's failure to disclose his preparation of Judge Cochonour's tax returns. The Administrator argues that no reasonable attorney in Cutright's position, given the ongoing nature of both his appearances before Judge Cochonour and his review of the judge's tax returns, could fail to realize that his consistent work for the judge should have been disclosed to his opponents. The Administrator concludes that Cutright's claim that he did not intend to deceive opposing counsel was not credible. At the very least, the Administrator states Cutright was reckless in his disregard of his legal obligation to reveal his relationship with Judge Cochonour.

Before the Hearing Board, Cutright asserted that he did not recall seeing or reviewing any of Judge Cochonour's individual tax returns. He did acknowledge that his secretary, with his authority, signed his name to at least three of Judge Cochonour's individual tax returns.

The Hearing Board held that, based on the testimony and the overall demeanor of Cutright, it was not convinced that he acted with the intent to deceive. Rather, it was their opinion that Cutright did not even think about the tax returns while he was handling the cases before Judge Cochonour. The Hearing Board found that Cutright was "simply oblivious about his ethical obligations and the existence or appearance of an impropriety." The Review Board also found that Cutright did not act with deceitful intent and made no false statements regarding the services he provided to Judge Cochonour. Therefore the Review Board found that while it did not condone the underlying conduct, it declined to extend Rule 8.4(a)(4) to omissions absent an intention to deceive.

In disciplinary decisions where this court has concluded that the respondent violated Rule 8.4(a)(4), there was some act or circumstances that showed the respondent's conduct was purposeful. See *In re Rinella*, 175 Ill. 2d 504 (1997) (where the respondent was found to have violated Rule 8.4(a)(4) after providing testimony that he knew to be false during a hearing before the Hearing Board); *In re Winthrop*, 219 Ill. 2d 526 (2006) (where the respondent was found to have violated Rule 8.4(a)(4) after relaying information that he knew to be false, to benefit one client at the detriment of another client).

Further, in a case where the respondent was initially charged with violating Rule 8.4(a)(4), and a violation was not found, this court came to that conclusion after determining there was no evidence the misconduct in that case was intentional. See *In re Witt*, 145 Ill. 2d 380 (1991) (where the court found that there was no violation of Rule 8.4(a)(4), because it was not persuaded that

the respondent's silence was intended to perpetrate a fraud).

Thus, we cannot say that the Hearing Board's finding that Cutright did not violate Rule 8.4(a)(4) is against the manifest weight of the evidence. Cutright acknowledges that he should have made certain disclosures to opposing counsel on those cases in which he appeared before Judge Cochonour. However, there is no evidence that Cutright ever received any money or favorable treatment in exchange for his preparation of Judge Cochonour's tax returns. Nor did he make any false statements or misrepresentations regarding his preparation of the tax returns. Cutright's initial decision to review the tax forms was based on his belief that he was reviewing the returns in conjunction with his work on the estate of Clark Cochonour.

There is essentially no way to define every act or form of conduct that would be considered a violation of Rule 8.4(a)(4). Each case is unique and the circumstances surrounding the respondent's conduct must be taken into consideration. That being said, based on the circumstances in this case, we decline to reverse the findings of the Hearing Board and the Review Board to conclude that Cutright violated Rule 8.4(a)(4).

### B. Appropriateness of Sanction

We next address what is an appropriate sanction for Cutright given his misconduct. The Administrator argues that Cutright should be suspended for two years based on the nature of his misconduct. Cutright, on the other hand, argues that the six-month suspension recommended by the Review Board is appropriate based on the circumstances in this case.

We note, initially, that we are not bound by the disciplinary recommendations of either the Hearing Board or the Review Board, as those recommendations are advisory, and the ultimate responsibility for imposing

discipline on attorneys rests with this court. *Timpone,* 208 Ill. 2d at 380. Generally, we strive for consistency and predictability in the imposition of sanctions. However, we recognize that each case is unique and must be decided on the facts set forth in that case. *Winthrop,* 219 Ill. 2d at 559. Our goal in imposing discipline on an attorney is not to punish the attorney, but rather to protect the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. *Winthrop,* 219 Ill. 2d at 559. This court considers evidence in aggravation and mitigation prior to imposing sanctions. *Winthrop,* 219 Ill. 2d at 559.

In mitigation, Cutright had no disciplinary record prior to the complaint filed in this case. Cutright testified as to his previous community involvement and his *pro bono* work with the Land of Lincoln Legal Assistance Foundation. He also presented six character witnesses at his hearing: three judges, two lawyers and a member of his community, all of whom testified that Cutright had a good reputation for honesty and integrity in the legal community. He also completed a professionalism seminar at the Illinois Professional Responsibility Institute and cooperated in the disciplinary proceeding.

However, in aggravation, we recognize that Cutright's misconduct was ongoing and arose out of three separate acts involving multiple clients. Cutright also did not appear to realize the wrongfulness of his actions. In regard to the Hayden estate, Cutright believed that he was merely doing what his client asked him to do. In the Carpenter estate, although there was no activity in the case for several years, Cutright believed that he was doing what was best for the estate. Additionally, Cutright's misconduct caused financial harm to the estates of both Hayden and Carpenter.

In determining a proper sanction for a disciplined attorney, we look to our previous sanctions in other

disciplinary proceedings before this court. For example, in *Witt*, which we discussed above, the respondent-attorney solicited and failed to disclose a loan from an attorney practicing before him. The respondent was suspended from the practice of law for six months. The court reasoned that while it considered improper the respondent's failure to disclose the debtor-creditor relationship, it was not persuaded that the respondent's silence was intended to perpetrate a fraud. *Witt*, 145 Ill. 2d at 391. Moreover, the respondent had a long career without previous discipline, had presented favorable character evidence and cooperated with the proceedings. *Witt*, 145 Ill. 2d at 403.

In *In re Twohey*, 191 Ill. 2d 75 (2000), the court suspended the respondent from the practice of law for six months for advising a client to loan funds to a company that he represented. Respondent was also the sole signatory on one of the company's accounts. We upheld the Hearing and Review Boards' findings that the respondent breached his fiduciary duty to his client and represented multiple clients in a single matter without an explanation to each client of what risks were involved. *Twohey*, 191 Ill. 2d at 84. Additionally, the respondent had also entered into a business transaction with a client without full disclosure, made a statement of material fact or law that he should have known was false, and engaged in conduct that tends to defeat the administration of justice or brings the courts or legal profession into disrepute. *Twohey*, 191 Ill. 2d at 84. We noted however, that the respondent had a long career without previous discipline, presented favorable character evidence and cooperated with the proceedings. *Twohey*, 191 Ill. 2d at 90.

In *In re Johnson*, 93 Ill. 2d 441 (1982), which we find instructive in this case, this court upheld a recommendation for a one-year suspension for the respondent for his

failure to file the necessary papers to have a divorce decree entered and for failing to timely close a probate estate. Similar to Cutright, the respondent in *Johnson* claimed that his failure to close the estate was based on differences that he had with the client over the amounts in the final report and account. *Johnson*, 93 Ill. 2d at 444.

We recognize that there are cases where the suspensions have been lengthier and other cases where the suspensions have been shorter. Although we use those sanctions imposed in cases previously before us as a guide, we also consider the unique facts and the circumstances surrounding this case to make our decision.

Having considered all of the relevant evidence and case law, the serious nature of Cutright's conduct, and the circumstances surrounding it, we conclude that a two-year suspension is appropriate in this case. Respondent John O. Cutright shall reimburse the Client Protection Program Trust Fund for any client protection payments arising from his conduct prior to the termination of the period of suspension.

## III. CONCLUSION

Respondent John O. Cutright is suspended from the practice of law for two years.

*Respondent suspended.*